Alexander Del Giorno, J.
These claims seek recovery for damages sustained by reason of the appropriation of portions of claimants land on two separate occasions, described on Map No. 568 as Parcel No. 568, for Thruway purposes, and the other described on Map No. 1259, as Parcels Nos. 1259 and 1260, entitled “ New York State Thruway, Hudson Section, Subdivision No. 8 ”, for building an overpass over the Thruway; for a description of the appropriated parcels included in the above-entitled and numbered claims, the court refers to and adopts the descriptions as shown and set forth on the maps thereof filed as aforesaid and attached to the claims herein.
The entire parcel of ground, of which the appropriated portions were part, was acquired by the claimant by two deeds, one dated May 16, 1931, recorded May 18, 1931 in Liber 333 of Conveyances at page 410, in the office of the County Clerk of Rockland County; the other dated March 18, 1940, recorded March 19,1940 in Liber 376 of Conveyances at page 471, in the office of the County Clerk of Rockland County.
Before the taking, the property had a frontage on Hungry Hollow Road for a distance of about 1,000 feet and lay about *144 350 feet south of Old Nyack Turnpike, which runs directly into Spring Valley, the main business center in that locality.
The first taking appropriated about 250 feet of its frontage on Hungry Hollow Road, and since the Thruway runs east and west, it took about 600 feet at the northerly end of the remaining land. Thus the remainder runs parallel to the Thruway for 600 feet but without access to it. The area taken was 1.853± acres.
A certified copy of the taking map and description were filed in the office of the Secretary of State of the State of New York on August 25, 1953 and in the office of the clerk of the County of Rockland on October 5, 1953, on which date title was vested in the State.
The second taking appropriated the entire frontage remaining on Hungry Hollow Road which is about 770± feet, starting at zero at the southerly extremity of the property and expanding at the northerly end to about 70± feet, and also a little triangular plot north of the Thruway which for some unknown reason had not previously been taken. This plot is 733± square feet. The larger area is about 0.550± acre or 23,961± square feet.
A certified copy of the taking map was filed in the office of the Secretary of State of the State of New York on October 4, 1954 and in the office of the clerk of Rockland County on January 6, 1955. Both claims were filed with the clerk of the court on October 1,1955.
These claims have not been assigned and were tried together. The trial was held on April 10, 11, 12; May 2, 3; June 3, 27, 28; July 1, 2, 8, 9 and 10, 1957. The court viewed the property on April 10, May 13 and July 16, 1957.
These viewings afforded the court the opportunity to examine the property after rain which continued for some days, at a time when vegetation was just beginning to sprout; when it had been warm and dry for some days and vegetation was in its growing stage; and last when it was hot and dry, and vegetation fully grown.
The land now remaining is roughly a rectangle fronting on Hungry Hollow Road on the east for about 770± feet, on the north about 1,200± feet; on the west about 1,000± feet, on the south about 970± feet. About 650 feet west of Hungry Hollow Road are located the buildings which constitute what is known as “ Gartner Hotel ”. These buildings are reached by Driveway No. 4, which is at the extreme southerly part of the remaining property and by Driveway No. 3, which is some 200 feet *145 north of it, both of which driveways connect before the buildings in the shape of a horseshoe. About 325± feet north of Driveway No. 3, and about parallel with it, there is a stone wall running westerly from the State’s right of way alongside the overpass for about 350± feet. North of the stone wall for almost its entire length there is a swamp running on the north to the right of way of the Thruway, and on the east to a point a short distance from the right of way of the overpass.
From the swamp, and through the stone wall, runs a natural creek which courses southerly across the claimant’s land under the two driveways into adjoining lands. This creek is generally parallel to Hungry Hollow Road and is west of it some 200± feet to 270± feet.
My viewings have disclosed that the land is highest generally from west to east, from north to south and partly from east to west, with the lowest grade at the swamp generally, as well as between the stone wall and the southerly boundary of the property for a distance of over 400 feet running from Hungry Hollow Road westward, forming a sort of saucer, the lowest grade being at about the creek.
Between the two driveways, ground is depressed in quite a few spots. South of Driveway No. 4 and west of the creek, I found a patch of swamp grass 40 feet in diameter, which the owner tried to destroy by burning.
The entire property north of Driveway No. 3, running from the road to near the Maple house is in a wild state, overgrown with all varieties of weeds and briars in addition to the swampy, spongy ground and leaching fields.
All the land west, however, north and for some 150 feet east of the location of the buildings is fine, dry ground, well wooded and well kept. On my first viewing I discovered a rivulet 40 feet south of Driveway No. 3, which sprang out of the ground about 150 feet east of the main building. It runs downward to within 40 to 50 feet west of the creek, where it formed a sort of delta because the soil along the lip of the creek was higher, and did not permit it to drain directly into the creek. The water made the ground soggy and wet.
An inspection of the buildings indicates a nice group of frame buildings, with sleeping, kitchen and eating equipment, well kept and neatly set up for guests of the Gartner hotel. This hotel- caters to Orthodox Jews and serves kosher food exclusively.
Having attempted to describe the property as it now is, we may now revert to what it was before the takings. The testi *146 mony indicates that then there was a pond directly north of the swamp, into which pond flowed a creek north of it, and into which drained surface water from a watershed of about 1,300 acres.
There was no testimony as to the depth of the pond, but it was testified that it acted as a “ restrainer ” and discharged its water into the swamp gently.
In addition thereto, there was on the land of the first taking the “ Datcha House ” with Driveway No. 1 leading to it from Hungry Hollow Boad and Driveway No. 2, a driveway leading into the wooded area used for dumping refuse. These were all taken. In addition thereto, Hungry Hollow Boad was eliminated in the Thruway area and closed at the northerly side of the remaining land. Thus, where before the distance to Spring Valley was about 1.4 miles, now, going southerly through two alternate routes the distance to Spring Valley was about 4 miles. Hungry Hollow Boad remained thus closed for over three years.
The land involved in the second taking was more or less even with Hungry Hollow Boad before the taking; after the taking the overpass was built over the Thruway, thus carrying Hungry Hollow Boad back to Old Nyack Turnpike. At the center, however, the overpass is at least 20 feet high. An embankment has been built, starting at zero at about some distance south of Driveway No. 3 and continuing higher to some 20 feet alongside the abutment of the overpass. In addition, the State destroyed some 600 feet of hedge fronting on Hungry Hollow Boad, and gates, posts, wire and fencing.
The claimant asserts that this embankment also drains rain water on her land as well as the swamp. She asserts, too, that it is detrimental in appearance to her property and business. The court concedes that while some drainage is added by the embankment, nevertheless if it is properly grassed and perhaps flowers and shrubs planted on it, claimant’s property will be enhanced, considering its location and the kind of growth and nonmaintenance thereat.
The State built a 42-inch culvert at about where the waters drained previously into the pond which is carried across under the Thruway to the south side. This drains into the swamp. The adequacy of the culvert is not seriously questioned; however, the claimant states that whereas the water previously dispersed itself in an easy natural way, and flowed slowly into the swamp, thus enabling its feeding in a like manner into Mrs. Bubin’s creek, it now rushes through the culvert into the swamp, pouring more water into it than the creek can take, *147 as a result of which water spreads into the ground laterally and permeates the ground, which results in water remaining on the surface after rains.
The claimant maintains that this condition is especially prevalent between Driveways 3 and 4, which she states cannot be used now by her guests, whereas previously they could play ball, walk and use it for their comfort.
In addition thereto, the State has built an 18-inch culvert which drains rain waters from the Thruway proper, an area about 1,800 feet long, into Mrs. Rubin’s swamp. This, it is stated, adds to the damaging of her property in the same manner as indicated for the 42-inch culvert.
The State does not deny that water is thus more forcibly injected into the swamp than prior to the construction of the Thruway, but contends that it causes hardly any damage to her property, since the Rubin creek easily takes this water and never overflows.
There are exhibits and testimony as to the overflowing of the Rubin creek and inundation of the ground about the creek for over 100 feet either side of it, which seem to have occurred after a hurricane, accompanied by heavy rains, in October or November, 1955. This is the only occasion of flooding which, in the opinion of the court, would have happened with or without the existence of the present conditions.
The court has studied State’s Exhibit J, which is a contour map of the subject property and its surroundings, and which is the most detailed and descriptive element in the case, presenting a complete picture of all matters before the court, and, in addition thereto, has examined minutely the property and the ground on at least three occasions. It is satisfied that there is a clay under the not too heavy top soil which is “ tight ” and not very porous. The “ wet land ” affected is generally low and is the recipient of drainage from its surroundings. The land north of the stone wall was and is swampy, with variegated growth of no commercial value. The land south of the stone wall and north of Driveway No. 3 is mostly soft, spongy, unattended, overgrown with weeds and of little value, except as an integral part of the remainder. This extends to a point near the Maple house where waste and rubbish are strewn about. There also are found the leaching fields.
The better part of the property is between Driveways 3 and 4. That is generally affected by its own natural topography. It is known as before described and has low spots as before indicated. .
*148 The claimant has filed her claim for damages for the direct taking, over which there is little dispute, including hedges, gates, posts, wire and fencing destroyed. As a matter of fact, the State experts allow more for the Datcha house than does the claimant’s expert.
In addition thereto, she asks consequential damages to her land due to the water condition described, the raising of the level of Hungry Hollow Boad, the closing of Hungry Hollow Boad for three years to the northward, the embankment created alongside of the overpass bridge, its drainage effect and the looks thereof, the results of the water flowage through the culverts into the swamp and creek on her property and the discomfort of the roundabout travel to and from Spring Valley and to her hotel buildings.
To assess damages herein, certain elements pertaining thereto must be clarified and eliminated first. In her testimony, claimant said that her hotel guests come to her direct by car or by bus to Spring Valley, were they take a cab to her place. In her bills of particulars she states that she lost no business at her hotel during those three years, for she specifically makes no claim for business loss. She states the Thruway is a detriment to her but concedes that people can get to her much faster and more easily.
This case was a long one and there were many witnesses, including real estate appraisers, civil engineers, hydraulic engineers, builders, hotel appraisers and a horticulturist. The case was well presented by counsel for both sides and their fine efforts have certainly aided the court in arriving at an amount which the court deems fair and equitable to both parties.
I am of the opinion that for the waters to be properly drained out of the swamp, the Rubin creek should be dug from the stone wall all the way through her property and for some 100 feet south of it where the descent is steep. It should be dug with a continuing gentle downward grade and lined on the bottom and for about two feet on its sides with loose rocks imbedded into the ground to permit a smooth flow of water and to prevent growth of weeds. The sides should slope towards a narrower bottom. The necessity for this has been brought about by the Thruway setup concerning drainage. The court is not necessarily of the opinion that the present arrangements cause any subsurface spread of the waters to the grounds of claimant, especially those between the two driveways, but it does feel that the State has added an element which did not previously exist and which in the future, especially after very heavy rains, could be the cause of damage. The deepening of the creek *149 would obviate such possibility. In addition thereto, the parties stipulated that if a dam were necessary in place of the stone wall to contain the waters before same dropped into the ditch, the cost thereof would be about $8,000. The State avers that there is no such necessity, although the claimant insists that there is. I find myself in a difficult position to decide this issue, although the same will be reflected in the consequential damages granted.
For the buildings I find no consequential damages. If anything, their use is enhanced by the Thruway and the overpass. They were set over 300 feet back from Hungry Hollow Road before the takings and are still at that approximate distance now. They were never touched by the takings and construction, and their attraction for the public never diminished. The “ look ” that surrounded them before is about the same now.
For the closing of Hungry Hollow Road I find no damage since the claimant had two alternate routes to travel on to reach Spring Valley.
I find that the direct damage for the first taking of 1.83 acres of land and the Datcha house was $12,000, and that the consequential damage for the first taking was $17,000, with interest from October 5, 1953 to April 4, 1954, and from October 1, 1955 to date of judgment.
I find that the direct damage for the second taking comprising the two parcels above mentioned was $1,100.
I find that the consequential damage involving change of grade of Hungry Hollow Road, creation of embankment and its effect upon the remaining land of claimant is $3,500.
I find that the damage for the destruction of hedges, posts, gates, wires and fencing is $2,500.
These three total $7,100, with interest from January 6, 1955 to July 5, 1955 and from October 1, 1955 to date of judgment.
The claimant has received a prepayment of $12,000, which shall be deducted from the judgment to be entered herein.
This constitutes the decision of the court as to the facts and the law in accordance with section 440 of the Civil Practice Act.
Enter judgment accordingly.